2020 IL App (1st) 17-0298-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
May 5, 2020

No. 1-17-0298

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County, Illinois, |
| | ) | Criminal Division |
| v. | ) | |
| | ) | |
| JOSEPH BOYCE, | ) | No. 01 CR 0942604 |
| | ) | |
| Petitioner-Appellant. | ) | The Honorable |
| | ) | Carol M. Howard, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.

Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court properly dismissed the petitioner's section 2-1401 petition for relief from judgment (735 ILCS 5/2-1401 (West 2012)) where the petitioner failed to state a meritorious claim of actual innocence based on newly discovered DNA testing.  The results of that new DNA testing were not of such conclusive character so as to have probably changed the result on retrial.

¶ 2    The petitioner, Joseph Boyce, appeals from the dismissal of his petition for relief from judgment filed pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2012)).  On appeal, the petitioner contends that the trial court erred when it

dismissed his petition both as untimely and on the basis that his claim of actual innocence predicated on DNA testing was without merit. For the reasons that follow, we affirm.

¶ 3                                    I.  BACKGROUND

¶ 4        The underlying facts of this case have been set forth adequately in the orders concerning the petitioner's direct appeal (see *People v. Boyce*, No. 1-05-1448 (2007) (unpublished order pursuant to Illinois Supreme Court Rule 23)) and the subsequent dismissal of his postconviction petition (see *People v. Boyce*, No. 1-08 2363 (2010) (unpublished order pursuant to Illinois Supreme Court Rule 23)). Accordingly, we set forth only those facts that are necessary to the resolution of the issues raised in this appeal.

¶ 5        The petitioner was charged together with three codefendants (Donnell Hayes, Michael Boyce and Jacky Burks) with first degree murder, attempted first degree murder, heinous battery, aggravated arson and residential arson, resulting from a gang-related fire, which was set at 1330 North Parkside Ave. in Chicago on March 10, 2001. The fire resulted in the death of four-year-old victim, Arman Kendley, and in severe injuries to his grandmother and cousin. The petitioner and codefendant Burks were tried by way of simultaneous but separate trials. Codefendants Hayes and Michael pleaded guilty to lesser charges in exchange for testifying for the State at those two trials.

¶ 6        The following relevant evidence was adduced at the petitioner's bench trial. The petitioner's cousin, Michael Boyce first testified that he, Burks and Hayes were members of the Body Snatchers faction of the Four Corner Hustlers street gang. Michael and Burks sold drugs in the area of Division St. and Parkside Ave. for Thomas Dean, who was a ranking member of the Body Snatchers gang, and another of Michael's cousins.

¶ 7        In March 2001, following a drug-sales dispute between the Body Snatchers and the Four

Corner Hustlers, multiple shootings took place, resulting, among other things, in the death of Thomas Dean. In the evening of March 10, 2001, a meeting of the Body Snatchers was held at a local school playground to discuss retaliation for Thomas' murder. Among about thirty people, the meeting was attended by the petitioner, Burks, Michael, and Thomas' brothers (Joseph, Richard and Henry Dean). A plan was devised to avenge Thomas' death by blowing up the home of the person suspected of killing him, and Burks indicated that he knew where the killer lived. The Deans could not be directly involved because that would be "too obvious," so Burks took the lead.

¶ 8      Michael averred that after the meeting Burks obtained a gun. Michael, Hayes, Burks and the petitioner then discussed plans to procure bottles, fill them up with gasoline and throw Molotov cocktails into a home located at 1330 N. Parkside Ave.

¶ 9      According to Michael, Burks retrieved a gasoline container from his own car, and then Hayes drove Burks, Michael and the petitioner to a gas station where they purchased gas and retrieved bottles to make the Molotov cocktails. Michael took a bandana form the glove compartment and gave it to the petitioner and Burks. They then drove to an alley near 1330 N. Parkside Ave. The petitioner and Burks exited the car and prepared the Molotov cocktails using the gasoline, bottles, and ripped pieces of the bandana. According to Michael, the petitioner wore gloves during this preparation. They agreed that Burks would throw his Molotov cocktail into the front of the house and the petitioner would throw his into the back.

¶ 10      Michael averred that shortly after 10 p.m., the petitioner and Burks threw their Molotov cocktails at the house. However, only Burks' Molotov cocktail ignited. The house was immediately engulfed in flames and Michael heard screaming from inside. He then watched Burks standing in front of the house with his gun waiting to shoot anyone who fled from inside.

¶ 11    Michael acknowledged that he was arrested together with Thomas Dean's brother, Joseph, inside Joseph's car, which was found to contain red gasoline cans and clothing that tested positive for gasoline residue. He also admitted that he initially lied that the police had coerced him into implicating the petitioner and Burks, and that instead he had received a deal to testify for the State.

¶ 12    Codefendant Hayes corroborated much of Michael's testimony. He stated that he had known the petitioner for about ten years and that the petitioner was a gang member. He further averred that the petitioner was present at the schoolyard meeting with Burks where plans were discussed for retaliation for Thomas' killing. According to Hayes, it was the petitioner who suggested that they blow up the home located at 1330 N. Parkside Ave., and it was Burks who added that he would shoot anyone who tried to run out of the burning house.

¶ 13    Hayes further testified that he drove the petitioner, Burks and Michael to a gas station where Burks and the petitioner obtained some large bottles and where Burks bought gasoline. Hayes told Burks that there was a bandana in the glove compartment that they could use in making Molotov cocktails and Michael reached into the glove compartment and handed the bandana to Burks and the petitioner. Hayes then drove to 1330 N. Parkside Ave., where he let the petitioner and Burks out of the car. When he returned to pick them up, the petitioner and Burks were both out of breath. Burks told Hayes that his Molotov cocktail ignited, and the petitioner told him that his had not.

¶ 14    The injured victims, as well as Arman's father, also testified at trial, recounting that a Molotov cocktail burst through the front window of the house and ignited, and that the fire quickly spread throughout. The victims described their severe burn injuries and lengthy hospitalizations. Arman's father also described that Arman was trapped in the house while the

fire burned, and that when he was finally able to locate him crying for help, he had to wrap Arman in a coat to carry him outside because his skin was too hot to touch.

¶ 15     The medical examiner testified that Arman died shortly after arriving at the hospital, and that his death was caused by inhalation injuries and thermal burns to 100 percent of his body. The manner of death was homicide.

¶ 16     The fire investigator assigned to the case determined that the fire was arson caused by a Molotov cocktail intentionally thrown into the living room.

¶ 17     The parties stipulated to a voluminous amount of physical evidence that was recovered at the scene, inventoried by the police, and later analyzed by forensic scientists. Among the items retrieved and inventoried were: a gasoline container, the glass bottle from the unignited Molotov cocktail, shoes, a footprint impression at the scene, a recovered handgun, upholstery from Hayes' car, clothing, and two pairs of gloves (one recovered from Joseph Dean's vehicle and the other from Hayes' car). The parties further stipulated that: (1) the recovered clothing and gloves tested positive for gasoline; (2) one of the containers contained gasoline; and (3) neither the bottle that the petitioner threw nor the gasoline cans obtained from the scene had any fingerprints that were suitable for comparison.

¶ 18     In the midst of trial, the parties litigated a motion to suppress inculpatory statements that the petitioner had made while in police custody. The petitioner first testified that two weeks after the fire, he arrived at the police station, accompanied by his attorney and an investigator, and surrendered himself to the police.

¶ 19     Chicago police Sergeant Anthony Wojcik testified that, when the petitioner arrived at the police station with his attorney, he was advised that he was being arrested for the arson-murder of a four-year old boy, which took place on March 10, 2001. The petitioner was read his

*Miranda* rights, and on the advice of his attorney, invoked his right to remain silent, at which point the police stopped questioning him. The petitioner was placed in a lineup and subsequently taken to a hospital for medical treatment of an ulcer. Later, when he returned to the police station, the petitioner was led to the lock-up area. Sergeant Wojcik testified that as he was taking the petitioner to the lock-up, the petitioner asked him what was going on. Sergeant Wojcik advised the petitioner of his *Miranda* rights, and then informed him that he was being charged with first degree murder and aggravated arson. The petitioner then asked, "[D]id he die from breathing smoke?" Sergeant Wojcik stated that the boy died from being badly burned and then showed the petitioner a morgue photograph of Arman. According to the sergeant, the petitioner began shaking and crying and said "[I]t wasn't supposed to be like this…No babies was supposed to be hurt… I got babies of my own…We didn't mean for this to happen."

¶ 20     The petitioner denied making any of these statements to the sergeant or ever initiating a conversation with him while being transported to the lock-up. Instead he claimed that after he returned to the police station from the hospital, Sergeant Wojcik asked him whether he wanted to make a statement, which he declined.

¶ 21     The trial court found Sergeant Wojcik's testimony credible and denied the petitioner's motion to suppress the inculpatory statements. The court found both that the petitioner's statements to the sergeant were voluntary and that he had initiated the conversation with the officer. The petitioner then stipulated to Sergeant Wojcik's testimony for purposes of trial.

¶ 22     After the State rested, the petitioner did not testify or present any evidence in his defense. The trial court found the petitioner guilty of first-degree murder, aggravated arson and two counts of heinous battery. The court noted that in coming to its decision it had relied on: (1) the testimonies of Michael and Hayes; (2) the numerous exhibits presented at the petitioner's trial;

and (3) the petitioner's custodial statements, which the court dismissed as confessions, but considered as acknowledgements by the petitioner that arson was intended to be used as "revenge" for Thomas Dean's killing.

¶ 23    With regard to Michael's and Hayes' credibility, the court recognized that because of the deals they had made with the State, their testimonies were "subject to suspicion and should be considered with caution." The court, however, noted that it had done so, and ultimately found that because both witnesses had testified consistently with their pretrial statements, and were corroborative of each other, their testimony was sufficient to find the petitioner guilty beyond a reasonable doubt.

¶ 24    The petitioner was subsequently sentenced to a total of 110 years imprisonment, including an extended term of 70 years for first degree murder, two consecutive terms of 20 years for each of the heinous battery convictions, and a concurrent term of 20 years for aggravated arson.

¶ 25    The petitioner appealed, contending that: (1) the trial court erred by admitting prior consistent statements from Michael and Hayes because they had had a motive to lie; and (2) his convictions violated the one-act, one-crime rule. *People v. Boyce*, No. 1-05-1448 (2007) (unpublished order pursuant to Illinois Supreme Court Rule 23)). This court affirmed the defendant's convictions on appeal. *Id*. The petitioner's request for leave to appeal to the supreme court was subsequently denied. *People v. Boyce*, 225 Ill. 2d 642.

¶ 26    On September 10, 2007, the petitioner filed a "Motion for DNA testing," and a "Petition for Mandamus" wherein he sought DNA testing of the two pairs of gloves recovered at the scene of the crime, in the hopes of establishing that they contained Joseph Dean's and not his DNA, and to prove his actual innocence. Although the report of the proceedings provided to us as part of the record on appeal does not include any transcripts related to these motions, the common law

record reveals, and the parties agree that the trial court denied both requests on November 9, 2007.

¶ 27    On April 15, 2008, the petitioner filed a postconviction petition, alleging a bevy of constitutional errors. Among these, the petitioner argued ineffective assistance of trial counsel for counsel's failure to: (1) investigate the crime scene area where the Molotov cocktails were made; (2) request DNA testing of the gloves found in Hayes' car; (3) impeach Hayes with inconsistent statements made in direct examination; and (4) properly cross-examine Michael. The petitioner also argued that appellate counsel was ineffective for failing to raise these issues on appeal. On June 13, 2008, the trial court summarily dismissed the petition as frivolous and patently without merit.

¶ 28    We affirmed the trial court's summary dismissal. *People v. Boyce*, No. 1-08 2363 (2010) (unpublished order pursuant to Illinois Supreme Court Rule 23)), *petition for leave to appeal denied*, 239 Ill. 2d 550 (2010). In doing so, we did not address the DNA issue as we found that we lacked jurisdiction since the petitioner had never appealed the trial court's denial of his motion for DNA testing. *Id.* We nonetheless remanded to the trial court for resentencing based upon the State's position on appeal that the trial court had improperly ordered the petitioner's sentence for aggravated arson to run concurrently with his sentence for first degree murder. *Id.*

¶ 29    On remand, on August 10, 2011, the trial court imposed a consecutive sentence for aggravated arson, for a total of 130 years' imprisonment. On remand, it was further discovered that the State had never responded to the petitioner's 2007 motion for DNA testing. The court continued the matter for status to give the State an opportunity to review the motion and respond. The State instead agreed to the DNA testing, and testing was ordered by the trial court on February 8, 2012. The testing was completed in September 2012 and revealed that the

petitioner's DNA was not on either pair of gloves retrieved by the police. Instead, one pair of gloves contained Richard Dean's DNA and the other Hayes'.

¶ 30     On October 30, 2012, the petitioner, with the assistance of counsel, filed a petition for relief from judgment (735 ILCS 5/2-1401(f) (West 2012)), arguing that: (1) the State committed a *Brady* violation when it failed to tender to the defense the results of a second set of finger and palm print testing from the Molotov cocktail bottle completed on August 14, 2002, that excluded the petitioner from handling the evidence at the crime scene; and (2) the petitioner's conviction was void because the new DNA testing performed on the gloves, was a material piece of evidence, which exonerated him. On December 18, 2012, the petitioner filed an updated version of the same petition wherein he raised identical claims, namely that: (1) the State committed a *Brady* violation; and (2) the petitioner had newly discovered DNA evidence of his actual innocence.[1]

¶ 31     On April 26, 2013, the State filed a motion to dismiss the petition for relief from judgment. The State argued, among other things, that: (1) a section 2-1401 petition (735 ILCS 5/2-1401 (West 2012)) was not the proper vehicle for raising the petitioner's constitutional claim of actual innocence; (2) the petition was untimely as it was filed outside of the statutory two-year time period; and (3) the petitioner's DNA evidence did not constitute "newly discovered evidence" since it was not sufficiently material and would not change the result on retrial.

¶ 32     On June 7, 2013, the petitioner filed a response to the State's motion to dismiss,

---

[1] On November 19, 2012, the petitioner also filed a motion to dismiss the charges against him pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) (725 ILCS 5/116-3 (West 2012)), arguing that the DNA testing had excluded him as the source of DNA found on either glove pair. On December 24, 2012, however, the petitioner withdrew this motion.

supplementing his previous claim of actual innocence with a new claim, namely that Michael's statement to the police implicating the petitioner in the crime was a result of police coercion. On December 20, 2013, the petitioner filed his second amended response.

¶ 33      The State filed a second motion to dismiss the petitioner's section 2-1401 petition on February 28, 2014. The petitioner filed a response to the State's second motion to dismiss, arguing, *inter alia*, that his petition had not been untimely. In this regard, the petitioner contended that because section 116-3 of the Code of Criminal Procedure (725 ILCS 5/116-3 (West 2012)) contains no limitation period for requesting DNA testing, "[t]he lack of a time limitation," in that section "must be read into section 2-1401 of the Code [of Civil Procedure (735 ILCS 5/2-1401 (West 2012))] when such petitions involve DNA evidence." The petitioner further claimed that the DNA evidence was not available to him until after the two-year time-limit set forth in section 2-1401 had already expired, because the State had failed to respond to his initial request for DNA testing. Accordingly, he argued that he should not be penalized where the delay was not caused by any lack of due diligence. The State filed its reply to the petitioner's response on July 18, 2014.

¶ 34      On February 20, 2015, the trial court heard arguments on the State's motion to dismiss.[2] On March 13, 2015, in a written order, the trial court denied the petitioner's motion for relief from judgment, finding, among other things, that none of the petitioner's claims were meritorious. The petitioner now appeals solely from the dismissal of his actual innocence DNA claim.

II. ANALYSIS

_____

[2] At the hearing, the petitioner additionally argued that if the court found his section 2-1401 petition was not the proper vehicle for his claims, the court should construe his pleading as a postconviction petition. The petitioner then outlined his cause and prejudice argument in case the trial court chose to treat his pleading as a successive postconviction petition.

¶ 35      We begin by setting forth the well-established principles regarding petitions for relief from judgment. Section 2-1401 of the Code represents a comprehensive statutory procedure by which final orders, judgments, and decrees may be vacated or modified in civil or criminal proceedings 30 days from their entry. *People v. Dodds*, 2014 IL App (1st) 122268, ¶ 17; see also *In re Dar. C.*, 2011 IL 111083, ¶ 104; *People v. Vincent*, 226 Ill. 2d 1, 7 (2007); *Warren County Soil and Water Conservation Dist. v. Walters*, 2015 IL 117783, ¶ 31. While section 2-1401 petitions are ordinarily used to bring facts to the attention of the trial court which, if known at the time of judgment, would have precluded its entry, they may also be used to challenge a purportedly defective judgement for legal reasons. *Warren County Soil*, 2015 IL 117783, ¶ 31.

¶ 36      To be entitled to relief under section 2–1401, a defendant must set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2–1401 petition for relief. *Dodds*, 2014 IL App (1st) 122268, ¶ 18; *People v. Pinkonsly*, 207 Ill. 2d 555, 566 (2003); see also *Vincent*, 226 Ill. 2d at 7–8. The quantum of proof necessary to sustain a section 2-1401 petition is preponderance of the evidence. *Vincent*, 226 Ill. 2d at 7. The petition must be supported by affidavit or other appropriate showing as to matters not of record. *Dodds*, 2014 IL App (1st) 122268, ¶ 18; *Vincent*, 226 Ill. 2d at 6; 735 ILCS 5/2–1401(b), (d) (West 2012).

¶ 37      In addition, the petition must be filed within two years after entry of the judgment being challenged. 735 ILCS 5/2–1401(a), (c) (West 2012); see also *Dodds*, 2014 IL App (1st) 122268, ¶ 19; *Vincent*, 226 Ill. 2d at 7. This two-year statute of limitations, however, does not apply to petitions brought on voidness grounds or where a clear showing has been made that: (1) the

person seeking relief was under legal disability or duress; or (2) the grounds for relief were fraudulently concealed. See *Dodds*, 2014 IL App (1st) 122268, ¶ 19.

¶ 38    Our standard of review depends on whether the petitioner has presented a factual or legal challenge to a final judgment or order. *Warren County Soil*, 2015 IL 117783, ¶ 31. If a petition raises a purely legal issue that does not involve a factual dispute, and the trial court enters a judgment on the pleadings, or dismissal for failure to state a cause of action, the reviewing court applies a *de novo* standard of review. *Id*. ¶¶ 47-48. If, on the other hand, a section 2-1401 petition raises a fact-dependent challenge to a final judgment, our review is for an abuse of discretion. *Id*. ¶ 50.

¶ 39    In the present case, on appeal, the petitioner makes two arguments regarding his actual innocence claim. First, he asserts that the trial court erred in finding that the petition was untimely because the DNA was obtained pursuant to section 116-3 of the Code of Criminal Procedure (725 ILCS 5/116–3 (West 2010)), which lacks a time limitation and is therefore exempt from the two-year statutory limitation period outlined in section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2012)). Second, the petitioner argues that the trial court erred when it found that his actual innocence claim was without merit.

¶ 40    The first of these arguments involves a purely legal question and is subject to *de novo* review. The second argument is fact-dependent and will therefore be reviewed for an abuse of discretion.

¶ 41    As a threshold matter, we note that with respect to the timeliness argument, the State concedes that section 2–1401(c) of the Code "explicitly exempts from its two-year statute of limitations petitions based on newly discovered DNA evidence based on the rights to DNA testing accorded in section 116–3 of the Code of Criminal Procedure." *People v. Davis*, 2012 IL

App (4th) 110305, ¶ 18 (citing 735 ILCS 5/2–1401(c) (West 2010)). The State agrees that under this statute, because section 116–3 of the Code of Criminal Procedure is silent on any limitations period during which motions for DNA testing may be filed (725 ILCS 5/116–3 (West 2012)) the lack of any time limitation in that section must be read into section 2–1401 of the Code when such petitions involve DNA evidence. *Id*. The State further points out that the trial court itself agreed with this analysis and found that (unlike the petitioner's *Brady* claim) his actual innocence claim was not time-barred. Accordingly, since the issue of timeliness is undisputed, we turn to the merits of the petitioner's actual innocence claim.

¶ 42    It is axiomatic that in order to succeed on a claim of actual innocence, the petitioner had to present "new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96. To be "new" the evidence must have been discovered after trial and been undiscoverable to the petitioner despite his due diligence. *Id*. To be "material" the evidence must be relevant and probative of the petitioner's innocence. *Id*. To be "noncumulative" the evidence must add to what the jury heard. *Id*. Finally, and most importantly, to be "conclusive" the evidence, when considered along with the trial evidence, must be of such character that it would "probably lead to a different result." *Id*.; see also *People v. Sanders*, 2016 IL 118123, ¶ 47. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Coleman, 2013 IL 113307,* ¶ 97; see also *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶28; *People v. Davis,* 2012 IL App (4th) 110305, ¶62 ("New evidence need not be completely dispositive of an issue to be likely to change the result upon retrial."). According to our supreme court, for the new evidence to be conclusive we must find that "it is more likely

than not" that no reasonable trier of fact would find the petitioner guilty beyond a reasonable doubt. *Sanders*, 2016 IL 118123, ¶ 47.

¶ 43    In the present case, the parties appear to agree that the DNA evidence was new, noncumulative and material to the petitioner's cause. Their dispute is therefore focused on the conclusive character of the evidence. In this respect, the petitioner asserts that because the trial court's guilty verdict was premised on Hayes' and Michael's testimonies, and the new DNA evidence directly contradicts Michael's statements that the petitioner wore gloves while preparing the Molotov cocktails, this evidence "casts a shadow on the credibility" of the State's key witnesses and "impeaches their testimony." According to the petitioner, the new DNA evidence now makes clear that none of the physical evidence collected at the crime scene contained either the petitioner's DNA or his fingerprints. We disagree.

¶ 44    Contrary to the petitioner's assertion, the new DNA evidence is not of such conclusive character as would probably change the result upon retrial. On direct appeal, we already held that the evidence against the petitioner was "overwhelming." *People v. Boyce*, No. 1-05-1448 (2007) (unpublished order pursuant to Illinois Supreme Court Rule 23)), *petition for leave to appeal denied*, 225 Ill. 2d 642. Specifically, two codefendants, Michael and Hayes, testified consistently regarding the petitioner's involvement in: (1) the meeting where the revenge-killing for Thomas Dean's death was planned; (2) the preparation of the Molotov cocktails; and (3) the execution of the arson. In addition, the petitioner himself made an inculpatory statement to Sergeant Wojcik acknowledging his participation in the crime. The petitioner offered no evidence to the contrary at trial. As such, even if the trier of fact were to be presented with the new DNA evidence, which shows that neither pair of gloves retrieved by the police contained the

14

petitioner's DNA, there nevertheless remains substantial unimpeached evidence proving the petitioner's guilt.

¶ 45    Our courts have repeatedly held that actual innocence means "total vindication," or "exoneration." See *People v. Evans*, 2017 IL App (1st) 143268, ¶ 30; *People v. Collier*, 387 Ill. App. 3d 630, 636 (2008); *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 33 ("The focus of a freestanding claim of actual innocence is on the new evidence itself, and whether it would totally vindicate or exonerate the defendant"). It is a claim that the petitioner is free of any criminal involvement, either in the crime for which he was convicted or any lesser included offense. *Evans*, 2017 IL App (1st) 143268, ¶ 30; see also *People v. Barnslater*, 373 Ill. App. 3d 512, 520 (2007).

¶ 46    In the present case, the new DNA evidence by no means exonerates or vindicates the petitioner. The presence of Hayes' DNA on the gloves retrieved from Hayes' car, and the presence of Richard Dean's DNA on the gloves that were recovered from his brother, Joseph Dean's car, are neither surprising nor prove that the petitioner did not participate in the crime. This evidence does not negate the petitioner's presence at the original playground meeting where the revenge-killing was planned, inside Hayes' car, at the gas station where the bottles and gasoline were obtained, or at the victims' residence where the attack was executed. Nor does it preclude the possibility that the petitioner wore a pair of gloves that were never recovered by the police. At best, this evidence impeaches Michael's testimony that the petitioner wore gloves while preparing the Molotov cocktails. This detail, in and of itself, even if known by the trier of fact, is insufficient to negate the petitioner's accountability for the crime. See *People v. Gecht*, 386 Ill. App. 3d 578, 582 (2008) ("DNA evidence that plays a minor role and is a collateral issue*** does not significantly advance a claim of actual innocence."); *People v. Brown*, 2013 IL

15

App (1st) 091009, ¶ 54 ("DNA evidence that does not match a defendant' DNA does not exonerate the defendant."); *People v. Allen*, 377 Ill. App. 3d 938, 944 (2007) ("The absence of defendant's DNA on the gun would not conclusively establish that he did not handle the gun or that he did not commit the * * * robbery").

¶ 47    Moreover, even if, as the petitioner asserts, the presence of Richard's DNA on the second pair of gloves weakens Michael's credibility, and further establishes his apparent motive to lie and implicate the petitioner so as to protect Joseph Dean, Hayes' unimpeached testimony and the petitioner's own inculpatory statements to police, alone, are more than sufficient for a conviction. Thus, in light of the State's overwhelming evidence against the petitioner, the DNA results do not have the probability to change the verdict on retrial. See *Sanders*, 2016 IL 118123, ¶ 53 (holding that the evidence was not so conclusive as to change the probable result on retrial where it merely impeached or contradicted the testimony offered by the State's witnesses).

¶ 48                                III.  CONCLUSION

¶ 49    Accordingly, for the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 50    Affirmed.